**ROSENBERG v. HANO et al.**

No. 7520.

Circuit Court of Appeals, Third Circuit.

June 30, 1941.

J. D. Rosenberg, of Philadelphia, Pa., for appellant.

Henry L. Schimpf, Jr., of Philadelphia, Pa. (Carr & Krauss, of Philadelphia, Pa., on the brief) for appellee.

Before CLARK, JONES, and GOODRICH, Circuit Judges.

CLARK, Circuit Judge.

This case seems to have been the cause of confusion in the courts below.[1] The plaintiff-appellant is an elderly and semi-retired member of the bar. He spent some, at least, of his leisure time in the customers' room of the corporate defendants, a firm of New York stock brokers. To keep from complete idleness perhaps, he traded on the stock exchange for both his wife's and his own account. The particular customers' man (Berger) with whom he had his dealings is the individual defendant. On November 13, 1936, the latter and a partner in the defendant firm showed the plaintiff-appellant a telegram from one Reitman, the editor of a New York tip sheet entitled "Coming Events",[2] reading, "Schenley for 15 point advance". At the same time, the customers' man, in the plaintiff-appellant's words:

"A. Berger said that Hano and Company, that is his firm, that the firm of Hano and Company had made an arrangement or a deal with Mr. Reitman where this Reitman had a syndicate of bankers who were to get in on this stock with the result that as a result of this deal the stock would advance within a reasonable time to fifteen points, and that that profit would be made and that I would be making it. * * *" J. D. Rosenberg, Plaintiff-Appellant's Brief and Record, p. 53.

Thereafter 100 shares of the stock recommended were purchased. It declined steadily—one had almost added, needless to say. In February 1938, plaintiff-appellant, again in his own words:

"Q. He said Hano had never made any deal with Reitman for any Banking Syndicate? A. As far as what was told me at the time I bought the stock, but he said that the deal that had been made with Reitman was for him to send telegrams in advance and that was to be followed up by this 'Coming Events', which is a financial service, or whatever they call it, where the story would be played up about that stock." J. D. Rosenberg, Plaintiff-Appellant's Brief and Record, pp. 58-59.

Irritated, not unnaturally, by these happenings, our "investor" fled for protection and restitution to the legislation designed, as he thought, for such as he. In his eagerness, he does not seem to have given much thought to either its philosophy or its terms. In fact, he seems to have labored under a complete misunderstanding of the civil liability scheme of the Securities and Exchange Acts. We say Acts because the Congress supplemented the first a year later.[3]

The purpose of the civil liability provisions of the first Act was to broaden the law of deceit. In that branch of the law of torts there had raged one of those controversies that delight lawyers and disgust laymen. It had its inception in the famous case of Derry v. Peek,[4] and stemmed from a 19th Century English Court's conservative reluctance to believe ill of the tycoons of its day.[5] We cannot pause for a general consideration of the consequences that have or should have followed upon the use of the tongue to induce injurious action. The gamut runs from penalizing the honest and mistaken to exculpating the foolish and fraudulent.[6] Suffice it to say

---

[1] Rosenberg v. Hano & Co., D.C., 26 F.Supp. 160; Rosenberg v. Hano, D.C., 39 F.Supp. 714, decided June 26, 1940.

[2] Which often do not cast their shadows before.

[3] 15 U.S.C.A. § 77a et seq. (Act of 1933); 15 U.S.C.A. § 78a et seq. (Act of 1934).

[4] [1889] 14 App.Cas. 337.

[5] An optimism signally dispelled in the tragic instance of Lord Kylsant, Rex v. Kylsant, 1931, 23 Crim.App. 83.

[6] Smith, Liability for Negligent Language, 14 Harvard Law Review 184; Williston, Liability for Honest Misrepresentation, 24 Harvard Law Review 415; Bohlen, Misrepresentations as Deceit, Negligence or Warranty, 42 Harvard Law Review 733; Carpenter, Responsibility for Intentional, Negligent and Innocent Misrepresentation, 24 Illinois Law Review 749; Weisiger, The Bases of Liability for Misrepresentation, 24 Illinois Law Review 866; Green, Deceit, 16 Virginia Law Review 749.

that Section 12[7] approximates saying to doing and tucks it under the same blanket of due care.[8]

█ The scheme of the 1934 Act is plain. It gave statutory sanction and administrative efficiency to the recently expanded case law against stock market manipulation. We say recently expanded[9] because our courts had lagged slightly behind their progenitors in England.[10] In both countries effect had been given to the realization that an honest security market depended on more than the exclusion of the cruder form of lying, such as wash sales, matched orders, and the like.[11] The essence of a free market is an appraisal of value. Such appraisal to be trustworthy must be ab initio, so to speak, and must reflect the honest judgment of those whose reason for buying is independent of and uninfluenced by its own probable effect. As Professor Berle puts it:

"But it had not been thought that rapid-fire buying and selling, where there was an actual change of ownership, solely for the purpose of creating the appearance of a 'broad' market, might constitute a misrepresentation. Actually, of course, the logic of the purchase is clear: representation that there is an active, or boiling, market in a stock is quite as material, and quite as likely to induce action, as a representation of price, or of any other fact. * * *" Berle, Stock Market Manipulation, 38 Columbia Law Review 393, 396.[12] The language of Section 9 under which this action was brought (manipulation of security prices[12a]) gives specific effect to the indicated judicial thinking. It makes unlawful wash sales,[13] matched orders,[14] market operations,[15] pegging,[16] under the rules of the Commission certain puts, calls, straddles, options, or privileges,[17] and for brokers and dealers, prophecies,[18] about the result of the aforesaid market operations, and, of course, any false or misleading statements.[19]

█ The ad damnum clause of the section[20] is worded in language appropriate to its objective. It reads:

---

[7] The section reads:

"Civil liabilities arising in connection with prospectuses and communications.

"Any person who—* * *

"(2) sells a security * * * by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security."

15 U.S.C.A. § 77l.

[8] Douglas and Bates, The Federal Securities Act of 1933, 43 Yale Law Journal 171, 190 et seq.; Shulman, Civil Liabilities and the Securities Act, 43 Yale Law Journal 227; Civil Liability Under Federal Securities Act, 50 Yale Law Journal 90; James, Securities Act of 1933, 32 Michigan Law Review 624, 650–656; Amendments to the Securities Act of 1933, 32 Michigan Law Review 1130,

1134–1137; Harper and McNeely, A Synthesis of the Law of Misrepresentation, 22 Minnesota Law Review 939; Fraud—Civil Liability Therefor Under Federal Securities Act, 18 Texas Law Review 507; cf. Hanna, Securities Exchange Act of 1934, 23 California Law Review 1, 2–3.

[9] Harris v. United States, 9 Cir., 48 F. 2d 771; United States v. Brown, D.C., 5 F.Supp. 81, affirmed, 2 Cir., 79 F.2d 321; Berle, Stock Market Manipulation, 38 Columbia Law Review 393.

[10] Scott v. Brown [1892] 2 Q.B.D. 724; Berle, Liability for Stock Market Manipulation, 31 Columbia Law Review 264.

[11] Berle, Liability for Stock Market Manipulation, 31 Columbia Law Review 264.

[12] Cf. Securities: Stock Market Manipulation at Common Law and Under Recent Federal Securities Legislation, 28 California Law Review 378.

[12a] 15 U.S.C.A. § 78i.

[13] § 9(a) (1) A, 15 U.S.C.A. § 78i(a) (1) (A).

[14] § 9(a) (1) B, C, 15 U.S.C.A. § 78i (a) (1) (B) (C).

[15] § 9(a) (2), 15 U.S.C.A. § 78i(a) (2).

[16] § 9(a) (6), 15 U.S.C.A. § 78i(a) (6).

[17] § 9(a) (6) (b) (1), (2), (3), and (c), 15 U.S.C.A. § 78i(a) (6), (b) (1), (2), (3), and (c).

[18] § 9(a) (3), 15 U.S.C.A. § 78i(a) (3).

[19] § 9(a) (4), 15 U.S.C.A. § 78i(a) (4).

[20] § 9(e), 15 U.S.C.A. § 78i(e).

"Any person who willfully participates in any act or transaction in violation of subsection (a), (b), or (c) of this section, shall be liable to any person who shall purchase or sell any security *at a price* which was *affected* by such act or transaction, and the person so injured may sue in law or in equity in any court of competent jurisdiction to recover the damages sustained as a result of any such act or transaction. * * *" 15 U.S.C.A. § 78i(e), italics ours.

Under this clause it is clear that the party claiming injury must plead and prove[21] some change in price, because of the prohibited acts. He must either have entered a false market or paid a false price to enter a genuine market. The plaintiff-appellant here has done neither. He paid the regular list price for a stock which he does not claim had been yet affected by the illegal act; an act, incidentally illegal, irrespective of whether its performance rested in substance or only in the wicked imagination of the defendants.

As we pointed out earlier, plaintiff-appellant erroneously brought this action under Section 9 of the Securities Exchange Act of 1934. His cause of action is not one contemplated by this provision. The alleged damage was caused by a misrepresentation which had no effect upon the price he paid for the stock. The statutory remedy, therefore, if one exists, is provided not by this Section, but by Section 12 of the Securities Act of 1933. If the plaintiff has established the elements of proof required by Section 12 of the Securities Act and its limitation provision, Section 13, his mistake was curable under our new and enlightened pleading.[22] Although he may make a tender of the stock he still holds, there is a barrier in Section 13 which he cannot hurdle.

Both statutes[23] implement the common law doctrine of time limitation in cases of fraud. That doctrine, founded on the belief that what you don't know about doesn't hurt you, does not require that the innocent, before entering into the transaction, use due diligence to investigate the facts misrepresented by the defrauder.[24] But the doctrine does add an incentive to vigilance. It requires that reasonable diligence be used toward discovering the fraud after the transaction is completed.[25] This requirement although omitted in the 1934 Act[26] was included in the express language of the 1933 Act.[27] Had the plaintiff-appellant been able to bring himself within the terms of the former as he attempted, we should have had to consider a complicated question in statutory construction. It would have turned on the theoretical intention of a legislative body which earlier expressly recognized a rule of law and later omitted the recognition.[28]

As it is, any assertion here of the reasonable diligence which is necessary for recovery under the 1933 Act must fall upon the deaf ears of even the most sensitive court. Plaintiff-appellant had been told of an "operation" which would bring about an immediate and pronounced rise in the recommended stock. Instead, he witnessed a prompt and gradual fall. The "how come" that would have occurred to the average reasonable man at once did not occur to this plaintiff-appellant until it was explained to him fifteen months later. Even the rather doubtful assumption of a confidential relationship between trader and

---

[21] Clark, Code Pleading, 421; Atkinson, Pleading the Statute of Limitations, 36 Yale Law Journal 914.

[22] Holtzoff, New Federal Procedure and the Courts, Chapter 3, Section 6, Amended and Supplemental Pleadings, at p. 50.

[23] 15 U.S.C.A. § 77m, 15 U.S.C.A. § 78i(e).

[24] See Restatement, Torts §§ 540 and 541; 2 Cooley, Torts (4th ed.) § 355; Clark, Torts § 74; Seeley, Torts (1939) § 293; Burdick, Torts (3d ed.) § 457.

[25] 26 C.J. 1143; Shonts v. Hirliman, D.C., 28 F.Supp. 478; Limitations of Actions—Fraud, 19 Iowa Law Review 381; Bartel, Statutory Limitation for Fraud Actions, 13 St. Johns Law Review 114; Dawson, Undiscovered Fraud and the Statute of Limitations, 31 Michigan Law Review 591; Securities Legislation—Civil Liabilities on Account of False Registration Statement—Limitations of Actions—Licenses, 38 Michigan Law Review 1103; cf. Failure to Use Reasonable Diligence to Discover Fraud—Reliance on Statement of Physician, 8 Texas Law Review 157.

[26] 15 U.S.C.A. § 78i(e).

[27] 15 U.S.C.A. § 77m.

[28] Sutherland, Rules of Statutory Construction (2d ed. 1904) § 401; Craies, Statute Law, pp. 133–136.

customers' man does not, in our opinion, turn this delay into reasonable diligence.[29]

■■ Our so holding makes it unnecessary for us to pass upon the suggestions of the learned district judge. We think both of doubtful validity. The prophetic character of the misrepresentation would seem sufficiently blended with facts to escape the impact of the forecast rule.[30] Nor are we impressed by the thought that it is a case of the pot calling the kettle black. Although the learned court below does not affix the appropriate legal tag, he is plainly thinking of the doctrine of in pari delicto. We do not believe it applicable. The mere fact that the plaintiff knew of the defendant's illegal actions and intended to profit upon them is not enough to place him in pari delicto. Although the plaintiff intended to profit from the illegality he was in no way to participate in the unlawful actions. "Mere knowledge of a borrower's illegal purpose will not deprive a lender of his right to recover money lent; but if the lender participates in the illegal use of the money lent, he cannot recover", 6 Williston Contracts, § 1755, pp. 4990-4991.[31] This is especially true where the statute, as in 15 U.S.C.A. § 78i(e) grants the plaintiff a right to relief. "Where a statute expressly authorizes one of the parties to an illegal agreement to sue, the right is, of course, clear." 17 C.J.S., Contracts, § 278, p. 667.[32] By the same token, we are not concerned with the rather impolite assertion that a broker is not a person.[33] It has been made and rebutted.[34]

The judgment of the District Court is affirmed.

---

[29] Failure to Use Reasonable Diligence to Discover Fraud—Reliance on Statement of Physician, 8 Texas Law Review 157; Fraud—Right of Buyer to Rely on Seller's Representations as to Value of Stock, 19 Virginia Law Review 299.

[30] 26 C.J. 1082, 1083, 1090, 1091; Promises and statements as to future events as fraud, sub-section V, Promises blended or associated with misrepresentations of fact, 51 A.L.R. 85 et seq.; 68 A.L.R. 638 et seq.; 91 A.L.R. 1299 et seq.; 125 A.L.R. 884 et seq.; Harper and McNeely, A Synthesis of the Law of Misrepresentation, 22 Minnesota Law Review 939, 946.

[31] See also Wright v. Stewart, C.C., 130 F. 905, 921; 21 Words and Phrases, Perm. Ed., 520 and 31 Words and Phrases, Perm. Ed., 82.

[32] "Where contracts or transactions are prohibited by positive statutes for the sake of protecting one set of men from another set of men, the one, from their situation and condition, being liable to be oppressed or imposed upon by the other, there the parties are not in pari delicto, and in furtherance of these statutes, the person injured, after the transaction is finished and completed, may bring his action and defeat the contract." Lord Mansfield in Browning v. Morris (1778) Comp. pt. 2, p. 790, 98 Eng.Reprint, 1364.

To like effect: 1 Restatement, Contracts § 601; 12 Am.Juris., Contracts, p. 734, §§ 217, 218; Fergus County v. Osweiler, 107 Mont. 466, 86 P.2d 410, 120 A.L.R. 1461.

[33] 15 U.S.C.A. § 77l.

[34] Cady v. Murphy, 1 Cir., 113 F.2d 988; Civil Liability Under the Federal Securities Act, 50 Yale Law Journal 90, 96.